S07A0824. JACKSON v. THE STATE.
(651 SE2d 702)

SEARS, Chief Justice.

The appellant, Shelton Jackson, appeals from his conviction of numerous crimes, including malice murder, stemming from the shooting death of Grant Reynolds.[1] On appeal, Jackson contends,

---

[9] *Woodard v. State*, 269 Ga. 317, 319-320 & n. 18 (496 SE2d 896) (1998).

[1] The crimes occurred on May 17, 2001, and Jackson was indicted on November 27, 2001, for the malice murder of Reynolds, for the felony murder of Reynolds with aggravated assault as the underlying felony, for the aggravated assault of Reynolds, for the aggravated assault of Larentae Mumphery, for the aggravated assault of Roger Mumphery, and for the possession of a firearm during the commission of a felony. On May 23, 2003, a jury found Jackson guilty on all counts of the indictment. On June 2, 2003, the trial court sentenced Jackson to life in prison for malice murder, to 20 consecutive years in prison for the aggravated assaults of Larentae and Roger Mumphery, and to five consecutive years in prison for the possession offense. The felony murder conviction was vacated as a matter of law, and the trial court merged the conviction for the aggravated assault of Reynolds with the malice murder conviction. On June 3, 2003, Jackson, who obtained new counsel for appeal, filed a motion for new trial. On February 24, 2004, the court reporter certified the trial transcript, and on September 6, 2005, Jackson filed an amended motion for new trial. The trial court denied the motion for new trial, as amended, on September 27, 2006, and Jackson filed a notice of appeal on October 2, 2006. The appeal was docketed in this Court on February 19, 2007, and was orally argued on July 17, 2007.

among other things, that his trial counsel provided ineffective assistance by failing to object to improper comments by the prosecutor on Jackson's right to remain silent and by failing to object to an improper "golden rule" argument by the prosecutor in closing. Because we conclude, among other things, that, even if Jackson's trial counsel provided deficient performance, Jackson has failed to prove the prejudice prong of his ineffectiveness claim, we affirm his convictions.

1. The evidence would have authorized a jury to find that, on May 17, 2001, Larentae Mumphery, Grant Reynolds, and Roger Mumphery (Larentae's cousin) went to an apartment complex in Atlanta to meet with Jackson and Jarvis Mathews so that Reynolds could inspect and possibly purchase a set of tire rims. Larentae Mumphery and Mathews had known each other in middle school and high school, and about a week before May 17, 2001, Larentae saw Mathews at a gas station and asked Mathews about some rims that were on his car. Mathews told Larentae that he had some more rims at his house, and Larentae later called Mathews and arranged to meet him at the foregoing apartment complex in order for Grant Reynolds to look at the rims. Larentae testified that Reynolds was not going to purchase the rims that day and did not have any money with him. According to Larentae, the trio met Mathews at the apartment about 4:00 p.m. on May 17, and Mathews called someone on his cell phone and told the person to bring the rims to the apartment.

Larentae testified that, a few minutes later, Jackson arrived at the apartment. Larentae stated that Jackson stood in the door of the apartment and never came inside; that Jackson and Reynolds spoke in the doorway; that he (Larentae) could see them the whole time; that Jackson screamed "where's the money"; and that Jackson then started shooting at the Mumpherys and Reynolds. According to Larentae, after Jackson started shooting, Reynolds "tussled" with Jackson and Reynolds then jumped back into the apartment. Larentae added that Reynolds and Jackson did not "tussle" before the shooting started. Larentae testified that, once Jackson shot at Reynolds, he pointed the gun at him and fired the gun. According to Larentae, once the shooting started, "everybody just started running" and tried to get out a back door or window that had burglar bars on it. Larentae added that, while the victims were running around, Jackson continued to shoot at them, and that, because he (Larentae) could not find a way out of the apartment other than through the front door, he laid down and played dead. Larentae also testified that he could not tell if Mathews had a gun, and that he did not know the exact number of shots that were fired, but that it seemed like it was about ten shots.

Roger Mumphery gave testimony that was consistent with the testimony given by Larentae, except that Roger testified that Mathews

also fired some shots. According to Roger, when Jackson and Reynolds were standing in the door, Jackson asked Reynolds "where the money at" and then started shooting at Reynolds. Reynolds then jumped into the apartment, and Jackson started shooting at the Mumpherys and Reynolds. Roger testified that all three victims were running around the apartment screaming that they did not have any money, and that Jackson was shouting "where the money at" and shooting at them. Roger added that Reynolds was not armed when he went to the apartment.

During the shooting, Larentae Mumphery was shot once in the thigh, and Grant Reynolds was shot twice and died from his wounds. Reynolds was found in a hallway off the main living room of the apartment. Police found eight shell casings at the crime scene, including some in the hallway and around the living room, and forensic evidence established that they were all fired from one gun. Moreover, the medical examiner testified that there was no soot, searing, or stippling on Reynolds, indicating that he was shot from a distance of greater than three feet. Jackson and Mathews fled the crime scene immediately after the shooting.

The Mumpherys both spoke with the police on the day of the shooting and identified the shooter as a very large man, with Larentae estimating that the shooter was about 6′ 1″ tall and 250 pounds. At trial, Jackson testified that he weighed about 300 pounds at the time of the shooting. In August 2001, both Roger and Larentae identified Jackson from photographic lineups without hesitation, and in September 2001, Jackson was arrested.

Jackson testified at trial that, when he arrived at the apartment, Grant Reynolds pulled a gun on him; that he (Jackson) and Reynolds struggled over the gun near the front door of the apartment; that the gun fired during the fight; that he got possession of the gun; that he "was scared" and "shot two times"; that he then ran out to his car; that he fell and the gun fired twice; and that he (Jackson) "didn't try to kill nobody, I was just fighting for my life. . . . I was just scared." On cross, Jackson admitted that he shot Reynolds, but that he did so "out of self-defense"; that he did not shoot at Larentae; and that Larentae must have gotten shot while Jackson and Reynolds were struggling over the gun.

Having reviewed the evidence in the light most favorable to the verdict, we conclude that the evidence was sufficient to authorize a rational trier of fact to find Jackson guilty beyond a reasonable doubt of the crimes for which he was convicted.[2]

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Jackson contends that trial counsel provided ineffective assistance by failing to object to improper comments by the prosecutor on Jackson's right to remain silent.

To prevail on his ineffectiveness claim, Jackson must show that counsel's performance was deficient and that, but for that deficient performance, there is a reasonable probability that the outcome of his trial would have been different.[3] Moreover, "[i]n ruling on an ineffectiveness claim, this Court need not analyze the deficient performance prong if the Court determines the prejudice prong has not been satisfied."[4]

Our examination of the record shows that the prosecutor did improperly comment on Jackson's silence by questioning him regarding why he did not come forward after the incident and report that he had acted in self-defense.[5] However, even if trial counsel's performance was deficient in failing to object to the prosecutor's comments, we conclude that Jackson has failed to carry his burden of proof on the prejudice prong of his ineffectiveness claim. In this regard, because two eyewitnesses testified that Jackson was under no threat of physical harm when he deliberately started shooting at them, because shell casings were found in the hallway and around the living room, thus contradicting Jackson's testimony that all the shots were fired at the front door of or outside the apartment, and because forensic evidence showed that Reynolds was shot from a distance of greater than three feet, there is significant evidence refuting Jackson's claim that he shot Reynolds in self-defense. For this reason, we conclude that Jackson has failed to show that, if trial counsel had objected to the prosecutor's comments, there is a reasonable probability that the outcome of the trial would have been different.[6]

3. Jackson contends that the prosecutor improperly commented in her opening statement on the evidence that she expected the defense would offer at trial, and that trial counsel provided ineffective assistance in failing to object to the comment.

In her opening statement, the prosecutor stated that she expected that Jackson's trial counsel would "probably say [Jackson] wasn't there during the attack, and he was somewhere else, at a beauty parlor or a barbershop. The evidence will show that it is clear

---

[3] *Myers v. State*, 275 Ga. 709, 713 (572 SE2d 606) (2002).

[4] *Fortson v. State*, 280 Ga. 435, 436 (629 SE2d 798) (2006).

[5] *Landers v. State*, 270 Ga. 189, 190-191 (508 SE2d 637) (1998); *Barnes v. State*, 269 Ga. 345, 352 (496 SE2d 674) (1998).

[6] See *Landers*, 270 Ga. at 190-191 (counsel performed deficiently in failing to object to comment on defendant's right to remain silent, but defendant failed to show prejudice); *Barnes*, 269 Ga. at 352 (trial court erred in permitting the prosecutor to comment on defendant's silence, but we concluded that the error was harmless considering that significant amount of evidence refuted the defendant's claim of self-defense).

that . . . [Jackson] was at [the crime scene] and shot and killed Grant Reynolds." Assuming that this statement violates the rule we established in *Parker v. State*,[7] which was decided after Jackson's trial, to the effect that "it is inappropriate for a prosecutor in a criminal case to discuss in opening statement the evidence she anticipates the defense will present at trial,"[8] and assuming that trial counsel provided deficient performance in failing to object to the comment, we conclude that Jackson has failed to carry his burden to establish the prejudice prong of his ineffectiveness claim. Because the trial court "clearly and repeatedly instructed the jury that opening statements were not evidence"[9] and clearly instructed the jury on the State's burden of proof,[10] and because there is significant evidence refuting Jackson's claim of self-defense, we conclude that Jackson has failed to carry his burden to show that, if trial counsel had objected to the prosecutor's comment, there is a reasonable probability that the outcome of the trial would have been different.[11]

4. Jackson next contends that the trial court erred in failing to give his requested charge on voluntary manslaughter. We conclude that the trial court did not err, as the State's evidence did not warrant a charge on voluntary manslaughter and as Jackson's testimony showed that he "was just fighting for [his] life" and that, in doing so, he panicked and shot the victim "out of self-defense." "At best, this evidence shows that [Jackson] was attempting to repel an attack, not that he was so angered that he reacted passionately."[12] Accordingly, the trial court did not err in refusing to charge on voluntary manslaughter.[13]

5. Jackson next contends that trial counsel provided ineffective assistance when he failed to object when the prosecutor made an impermissible "golden rule" argument in closing.

In his closing argument, the prosecutor described Reynolds as a man who was 32 years old at the time of the murder and who was survived by his mother, father, brother, sister, and children. The prosecutor asked the jury, when it thought about Jackson and how he "sit[s] here," "to [also] think about what [Reynolds's] family had to

---

[7] 277 Ga. 439, 439-442 (588 SE2d 683) (2003).

[8] Id. at 441.

[9] Id. at 441-442 (such a charge supports conclusion that prosecutor's improper comment in opening statement regarding a defendant's anticipated alibi defense is harmless).

[10] *United States v. Hall*, 165 F3d 1095, 1116 (7th Cir. 1999) (trial court's charge is a factor to consider in determining whether improper comment on anticipated alibi defense in prosecutor's opening statement denied defendant a fair trial).

[11] *Strickland v. Washington*, 466 U. S. 668, 694 (104 SC 2052, 80 LE2d 674) (1984); *Landers*, 270 Ga. at 191.

[12] *Bell v. State*, 280 Ga. 562, 567 (629 SE2d 213) (2006).

[13] Id.; OCGA § 16-5-2 (a).

suffer through and . . . I would ask that you find [Jackson] guilty of each and every charge."

A "golden rule" argument " 'is one which, either directly or by implication, tells the jurors that . . . they should put themselves in the injured person's place and render such a verdict as they would wish to receive were they in the (injured person's) position.' "[14] "Such an argument is impermissible because 'it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.' "[15]

Assuming that the prosecutor's argument in the present case violated the golden rule and that trial counsel provided deficient performance in failing to object to the argument, we conclude that, as there was significant evidence refuting Jackson's claim of self-defense, there is not a reasonable probability that, if trial counsel had objected to the argument, the outcome of the trial would have been different.

*Judgment affirmed. All the Justices concur, except Hunstein, P. J., and Thompson and Melton, JJ., who dissent.*

HUNSTEIN, Presiding Justice, dissenting.

"Mr. Jackson, you didn't call the police, did you?" That was the very first question out of the mouth of the assistant district attorney on the cross-examination of appellant. The second question was no better: "And you didn't call 911 or the emergency to get [the murder victim] any help, did you?" The improper questioning did not stop there. The prosecutor also asked:

"But you were so afraid that you ran to the police and you told them that, hey, these guys tried to set me up, they tried to kill me . . . is that what you did?";

"You didn't think that was important to tell the police if you called [sic] yourself acting in self-defense, I guess?";

"And you didn't think it was important to tell the police that you killed somebody since you were so afraid?";

"And then back in June of 2001 did you ever tell the police, or the district attorney's office, or anybody, that you had killed [the murder victim] and that you were acting in self-defense?";

"And, Mr. Jackson, you are familiar with 911; is that correct?";

"Was there anything that was hindering you from contacting the police — particularly Detective Balkcom — to let him know, hey, by

---

[14] *Braithwaite v. State*, 275 Ga. 884, 892 (572 SE2d 612) (2002) (Sears, P. J., concurring) (citation omitted).

[15] Id. at 894 (Hunstein, J., dissenting) (citation omitted). Accord *United States v. Roman*, 492 F3d 803, 806 (7th Cir. 2007); *United States v. Palma*, 473 F3d 899, 902 (8th Cir. 2007).

the way, there is this guy that was trying to shoot at me, so I shot him and I killed him, was there anything preventing you from doing that?";

"And from 2001 to 2003 the first time that you mentioned self-defense is here today in court?";

"Did you contact the Atlanta police department and say, hey, these guys tried to attack me, I was acting in self-defense?";

"So the first time that you said this or mentioned this is today in open court now that you're on the stand, is that correct?"

Appellant was the last witness to testify. Closing arguments followed and the same prosecutor, while addressing the jury, maintained the focus on appellant's pre-arrest silence:

> In addition to Shelton Jackson's testimony, I think it is very strange that somebody would all of a sudden two years later now take the stand and say they were acting in self-defense when he had ample opportunity to tell the police or to call 911 or to call anybody and let them know what happened. He chose not to do that and that is because he knew that they murdered [the victim] on May 17, 2001.

The law is very straightforward and clear: "the state may not comment on either a defendant's silence prior to arrest or failure to come forward voluntarily, even when the defendant chooses to testify at trial." *Landers v. State*, 270 Ga. 189, 190 (2) (508 SE2d 637) (1998). This easy-to-remember, bright-line rule has been the law of this State since 1991. *Mallory v. State*, 261 Ga. 625 (409 SE2d 839) (1991). Despite repeated reminders of this rule in cases since *Mallory* was decided, the State deliberately ignored this well-established rule when it cross-examined appellant and argued its case to the jury.

As the above questions establish, the improper questioning in this case was not a matter of a few questions or an unpursued issue, compare *Moore v. State*, 278 Ga. 397 (2) (b) (603 SE2d 228) (2004) (State did not persist in its improper questioning) or *Rickman v. State*, 277 Ga. 277 (4) (587 SE2d 596) (2003) (two improper questions posed). The improper questioning was the main focus of the State's cross-examination of appellant, with ten specific questions about his pre-trial silence and numerous indirect questions supporting or leading up to the improper ones, over the course of a mere 14 pages of trial transcript. The strategy behind the improper questioning became manifest when the prosecutor used appellant's pre-arrest silence as a central part of its argument during closing. Evidence that this Court has expressly recognized as too prejudicial to be allowed at trial was deliberately elicited for the tactical advantage it provided the State in undermining appellant's sole defense.

Thus, I cannot agree that this was merely "improper[ ] comment," as the majority characterizes it. Maj. Op. p. 497. Rather, this was flagrant and repeated prosecutorial misconduct. The State deliberately used appellant's pre-arrest silence to prejudice his defense. This intentional violation of well-established law should be met with the harshest condemnation by this Court. But even though it recognizes defense counsel's deficiency in failing to object to this prosecutorial misconduct, the majority refuses to hold the State accountable by, yet again, excusing this misconduct as harmless under the rubric of "overwhelming evidence." Yes, I agree with the majority that the evidence adduced at trial was *sufficient* to enable a rational trier of fact to find appellant guilty of the charged crimes beyond a reasonable doubt, see Maj. Op., Division 1, supra; but in no sense of the word can the evidence adduced in this case be considered "overwhelming."

> As the majority's holding in this case amply demonstrates, "overwhelming evidence" no longer depends upon the amount and quality of evidence of guilt adduced at trial. Instead, "overwhelming evidence" has become the catch phrase that excuses all error.

*Braithwaite v. State*, 275 Ga. 884, 899 (572 SE2d 612) (2002) (Hunstein, J., dissenting). This case presents an even more egregious example of prosecutorial misconduct than that in *Braithwaite*, because here the State not only argued an impermissible topic to the jury, it elicited evidence too prejudicial to be allowed at trial and did so not just from any witness but from the defendant himself.

Under these circumstances, I would hold that for the purposes of the second prong of *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), appellant carried his burden of showing that his defense was prejudiced both by the admission of evidence the State improperly elicited on cross-examination regarding his pre-arrest silence and by the State's use of that evidence during closing argument to undermine his claim of self-defense. Because evidence sufficient in this case to meet the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), was not so overwhelming as to render harmless the prejudice to appellant's defense, I respectfully dissent to the majority's affirmance of appellant's conviction.

I am authorized to state that Justice Thompson joins this dissent.

DECIDED OCTOBER 9, 2007.

*Brian Steel*, for appellant.

*Paul L. Howard, Jr., District Attorney, Peggy R. Katz, Bettieanne C. Hart, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Benjamin H. Pierman, Assistant Attorney General,* for appellee.